**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**DAVID M. PAYNE**
Ryan & Payne
Marion, Indiana

ATTORNEYS FOR APPELLEE:

**DEBORAH S. BURKE**
Indiana Department of Child Services
Marion, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

**FILED**

Feb 08 2012, 10:00 am

**CLERK**
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE TERMINATION OF ) 
THE PARENT-CHILD RELATIONSHIP OF K.M.: )
)
H.M., )
)
    Appellant-Respondent, )
)
        vs. )    No. 27A05-1107-JT-329
)
INDIANA DEPARTMENT OF CHILD SERVICES )
)
    Appellee-Petitioner. )

APPEAL FROM THE GRANT SUPERIOR COURT
The Honorable Dana J. Kenworthy, Judge
Cause No. 27D02-1001-JT-8

**February 8, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

H.M. (Father) appeals the involuntary termination of his parental rights to his child, K.M. Father challenges the sufficiency of the evidence supporting the trial court's termination order.

We affirm.

Father is the biological father of K.M., born in April 2008. At the time of K.M.'s birth, paternity had not been established, and K.M.'s biological mother, A.J. (Mother), was the sole legal custodian of the child.[1] The facts most favorable to the trial court's judgment reveal that in July 2008, the local Grant County office of the Indiana Department of Child Services (DCS) received a referral for neglect involving Mother and K.M. Specifically, the referral alleged Mother had been using marijuana and alcohol in the family home while caring for both K.M. and, during unsupervised in-home visits, K.M.'s older half-sibling, A.V., who was already the subject of an open child in need of services (CHINS) proceeding.[2] The report also indicated that an unknown male had been living in the family home in violation of the safety plan Mother had signed as part of the CHINS case pertaining to A.V.

During DCS's investigation of the matter, Mother initially denied, but later admitted to, several of the allegations, including that she had used drugs and alcohol while the children were present and that a male friend had been living in the home. Additionally, when DCS case manager Lisa Juday asked Mother whether she believed K.M. was safe in her care,

---

[1] Mother's parental rights to K.M. were involuntarily terminated by the trial court in its June 2011 termination order. Because Mother does not participate in this appeal, however, we limit our recitation of the facts to those pertinent solely to Father's appeal.

[2] The record indicates that K.M. was not removed from Mother's care at birth despite the open CHINS case involving A.V. due to Mother's participation and progress in services at that time. Father is not the biological father of A.V.

Mother answered, "[N]o." *Exhibits* at 12. Based on these and other facts, K.M. was taken into emergency protective custody. K.M. was later placed in relative foster care.

At the time of K.M.'s birth, Father was incarcerated in the Grant County Jail on class A misdemeanor charges for intimidation, battery resulting in bodily injury, and possession of marijuana charges arising from an incident that occurred at Mother's home in September 2007. Father later pled guilty to all three charges and was released in June 2008. Father never saw K.M. following his release from incarceration, however, because Father was prohibited from having any contact with Mother under the terms of an Order of Protection.

In October 2008, following a hearing on an amended CHINS petition, K.M. was adjudicated a CHINS and made a temporary ward of DCS. Father was thereafter offered some provisional services but "was very adamant" that he was not going to participate in any services until court-ordered to do so. *Transcript* at 41. Following a dispositional hearing later the same month, the trial court issued its dispositional order formally removing K.M. from Father's care and custody. The court's dispositional order also incorporated a parental participation plan and directed Father to successfully complete various tasks and services designed to facilitate his reunification with K.M. Specifically, Father was ordered to, among other things: (1) submit to random drug screens and maintain a drug-free lifestyle; (2) participate in a drug and alcohol assessment evaluation and follow any resulting recommendations; (3) complete parenting classes; and (4) undergo a psychological evaluation and follow any and all recommendations.

Father's participation in court-ordered reunification services was inconsistent from the start and ultimately unsuccessful. Father refused to submit to random drug-screen requests

3

from November 2008 through July 2009. Although Father did complete a ten-week parenting class, he refused to undergo both the court-ordered psychological examination and drug and alcohol assessment. Father also informed case workers that he did not intend to participate in court-ordered services because he "didn't see the need" for services. *Id.* at 43. As for visitation with K.M., Father initially participated in several visits with K.M. in the Fall of 2008, but then stopped attending scheduled visits in mid-December 2008 when he was asked to take a drug screen before the visit. Father continued to refuse to participate in scheduled visits with K.M. until August 2009, but his visits remained sporadic until January 2010 after the trial court approved DCS's request to initiate termination proceedings following a permanency hearing in December 2009.

Based on Father's lack of progress in reunification services and unresolved substance-abuse issues, DCS filed a petition seeking the involuntary termination of Father's parental rights to K.M. in January 2010. A three-day evidentiary hearing on the termination petition commenced on April 20, was continued on April 21, and concluded on May 31, 2011.

At the time of the termination hearing, Father was again incarcerated in the Grant County Jail on battery and domestic battery convictions, with the victim of the domestic battery conviction being the mother of one of Father's older children. Although Father had an expected out-date in July 2011, while still incarcerated he was convicted of trespass and disorderly conduct in another, unrelated criminal matter in May 2011. As a result, Father was sentenced to another year of incarceration to begin after the completion of his current sentence. Father therefore did not expect to be released from incarceration until at least December 2011, assuming he received good-time credit.

4

In addition to Father's ongoing criminal matters and incarceration, during the termination hearing DCS presented evidence establishing that Father had refused to participate in and/or successfully complete a majority of the court-ordered reunification services, including a psychological examination and substance-abuse treatment, and remained incapable of demonstrating he could provide K.M. with a safe, stable, and drug-free home environment. The evidence presented by DCS further showed K.M. was living and thriving in a pre-adoptive, relative foster care placement with the only family the child had ever known.

At the conclusion of the termination hearing, the trial court took the matter under advisement. On June 2, 2011, the trial court entered its judgment terminating Father's parental rights to K.M. Father now appeals.

Initially, we note that when reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204 (Ind. Ct. App. 1999), *trans. denied*. Thus, if the evidence and inferences support the trial court's decision, we must affirm. *Id.*

Here, the trial court made detailed findings in its order terminating Father's parental rights. Where the trial court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839

5

N.E.2d 143 (Ind. 2005). First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the trial court's conclusions or the conclusions do not support the judgment thereon. *Quillen v. Quillen*, 671 N.E.2d 98. The traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011) (quoting *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*). Although parental rights are of a constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144 (Ind. Ct. App. 2008). In addition, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832 (Ind. Ct. App. 2001).

Before an involuntary termination of parental rights may occur in Indiana, the State is required to allege and prove, among other things:

(B)     that one (1) of the following is true:

(i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
* * *
(C)     that termination is in the best interests of the child . . . .

6

Ind. Code Ann. § 31-35-2-4(b)(2) (West, Westlaw through end of 2011 1st Regular Sess.). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code Ann. § 31-37-14-2 (West, Westlaw through end of 2011 1st Regular Sess.)). If the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. I.C. § 31-35-2-8 (West, Westlaw through end of 2011 1st Regular Sess.). Father challenges the sufficiency of the evidence supporting the trial court's findings as to subsections (b)(2)(B) & (C) of the termination statute cited above. *See* I.C. § 31-35-2-4(b)(2).

At the outset, we note that DCS needed to establish only one of the three requirements of subsection (b)(2)(B) by clear and convincing evidence before the trial court could terminate parental rights. *See In re L.V.N.*, 799 N.E.2d 63 (Ind. Ct. App. 2003). Here, the trial court found DCS presented sufficient evidence to satisfy the first two subsections of (b)(2)(B) of the termination statute. *See* I.C. § 31-35-2-4(b)(2)(B)(i) & (ii). Because we find it dispositive under the facts of this particular case, we shall consider only whether clear and convincing evidence supports the trial court's findings regarding subsection (b)(2)(B)(i), namely, whether there is a reasonable probability the conditions resulting in K.M.'s removal or continued placement outside Father's care will not be remedied.

In making such a determination, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there

7

is a substantial probability of future neglect or deprivation of the child. *In re M.M.*, 733 N.E.2d 6 (Ind. Ct. App. 2000). Similarly, courts may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244 (Ind. Ct. App. 2002), *trans. denied.* The trial court may also consider the services offered to the parent by a county office of the Indiana Department of Child Services and the parent's response to those services, as evidence of whether conditions will be remedied. *Id.* Finally, a trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth are permanently impaired before terminating the parent-child relationship. *In re E.S.*, 762 N.E.2d 1287 (Ind. Ct. App. 2002).

Here, in finding there is a reasonable probability the conditions resulting in K.M.'s removal and/or continued placement outside of Father's care will not be remedied, the trial court made detailed findings regarding Father's unresolved substance-abuse issues and lack of progress in improving his ability to care for K.M. despite a wealth of services available to him. Specifically, the court noted Father's recurrent periods of incarceration throughout the underlying proceedings, his refusal to participate in services including a majority of DCS's random drug screen requests and countless opportunities to visit with K.M. for nearly one year. As for Father's unresolved struggles with substance abuse, the trial court noted Father's testimony during the CHINS fact-finding that he "was a practicing Rastafarian and, as such . . . admitted to regular use of marijuana." *Appellant's Appendix* at 12. The court further found:

8

> Despite Father's testimony that he is currently not abusing any substances . . . he has a long history of substance abuse. Father admitted to marijuana use since age 11 and use of crack cocaine between the years 1992 to 1998. . . . By Father's own admission, he was addicted to drugs, including cocaine and marijuana, and to alcohol. However, Father failed to complete a substance abuse treatment program in the nearly three years since the beginning of the CHINS proceeding.

*Appellant's Appendix* at 12. Although the trial court thereafter acknowledged Father's testimony that he eventually underwent a substance-abuse evaluation and began participating in group substance-abuse counseling sessions on his own accord, the court noted Father's own admissions that he was "kicked out of the program" and thereafter concluded it was "therefore undisputed that Father never successfully completed a drug and alcohol program." *Id.* In addition, the trial court found Father's testimony regarding his participation in Alcoholics Anonymous meetings, including his testimony that he called his sponsor "all the time", to have "little credibility" given Father's inability to recall his sponsor's name. *Id.* The court likewise assigned "little weight" to Father's testimony that he had also completed a psychological evaluation on his own, due in part to the lack of documentary evidence and independent corroboration offered by Father. *Id.* The trial court also found as follows:

> p. Father's actions throughout the CHINS proceeding show a general disdain for the requests of [DCS] and for the Court. Father refused to submit to drug screens from the entry of the November 13, 2008 Dispositional Order requiring him to do so, until July 2009. In December 2008, Father told both Joseph Tinsley and Dee Fields that he did not intend to participate in services that were ordered by the CHINS court.
>
> q. At no time during the underlying CHINS proceeding did DCS, any service provider, or CASA recommend that [K.M.] be . . . placed in Father's care.

9

r.      Neither parent made significant changes in their lifestyles in order to be reunified with [K.M.].

* * *

t.      Father had long periods of time where [he] failed to visit with [K.M.]. . . . [He] chose not to visit [K.M.] for most of 2009. . . . Due to Father's current incarceration, Father has not seen [K.M.] since December 2010. Clearly, a relationship with [K.M.] has not been a consistent priority for either parent.

*Id.* at 12-13. Based on these and other findings, the trial court concluded that there was a reasonable probability that the conditions resulting in K.M.'s removal and continued placement outside Father's care will not be remedied. Our review of the record convinces us that these findings are supported by abundant evidence.

During the termination hearing, it was the general consensus of all case workers and service providers, as well as the court-appointed special advocate ("CASA") Martha Miller, that Father had failed to adequately address his substance abuse issues and parenting deficiencies during the CHINS case such that K.M. could be safely returned to his care. Specifically, DCS case managers Joseph Tinsley and Amy Shutters confirmed that Father had failed to complete both the court-ordered substance-abuse evaluation and a psychological examination, refused to submit to numerous, random drug-screen requests, was incarcerated at the time of the termination hearing, and had not visited with K.M. since December 2010. In so doing, Tinsley testified Father was "very resistant to all the referrals that were made," that Father told Tinsley, "I'm not crazy," and that Father just "didn't see a need" for participating in reunification services. *Id.* at 42-43. Tinsley also indicated Father had informed him that he "didn't view marijuana as being a drug." *Id.* at 44.

10

Father's own testimony lends further support to the trial courts findings. During the termination hearing, Father indicated he did not believe smoking marijuana was dangerous and that he continued to use marijuana and alcohol until just days before his incarceration in 2010, and that he was "kicked out" of the substance-abuse groups he was attending. *Transcript* at 366. Father also admitted he did not attend many scheduled visits with K.M., due in part to his incarcerations.

This court has repeatedly recognized that "[i]ndividuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 375 (Ind. Ct. App. 2006), *trans. denied*. Moreover, where a parent's "pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). Here, Father has demonstrated a persistent unwillingness and/or inability to take the actions necessary to show he is capable of overcoming his addiction to illegal substances, refraining from criminal activity, and providing K.M. with the safe, stable, and drug-free home environment he needs. Father's arguments on appeal amount to an impermissible invitation to reweigh the evidence. *See In re D.D.*, 804 N.E.2d 258.

We next consider Father's assertion that DCS failed to prove termination of Father's parental rights is in K.M.'s best interests. In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the Indiana Department of Child Services and look to the totality of the evidence. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185 (Ind. Ct. App. 2003). In so doing, the

11

trial court must subordinate the interests of the parent to those of the child. *Id.* The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.* Moreover, we have previously held that the recommendations of both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *In re M.M.*, 733 N.E.2d 6.

In addition to the findings previously discussed, the trial court made several additional pertinent findings in determining that termination of Father's parental rights is in K.M.'s best interests. Specifically, the trial court found that Father's testimony at trial "made it clear that Father has no respect for the law, for the authority of the Court or for anyone who he believes is not on 'his side.'" *Appellant's Appendix* at 13. The court also noted that Father's testimony shows he is "more focused upon himself and his belief that the Court, DCS, law enforcement, [K.M.'s] foster mother, and even his former court-appointed counsel are all 'against' him, than any concern for [K.M.'s] best interests," that Father's commitment to K.M.'s well-being "yields" when Father is "unhappy or angry with something or someone," and that Father's "lack of personal responsibility, constant paranoia that others are involved in a conspiracy against him," and "disregard for the rule of law" are of a "paramount concern to the Court," particularly when considering that Father would "serve as the primary male role model for [K.M.] were the parent-child relationship to continue." *Id.* at 13-14. Finally, the trial court found that termination of Father's parental rights is in K.M.'s best interests in light of the facts: (1) K.M. has been out of Father's care for nearly three years and

12

the majority of his life; (2) the CASA and DCS case managers recommended termination of Father's parental rights and emphasized K.M.'s need of stability and permanency in his life; and (3) K.M. is thriving in relative foster placement where his medical, physical, and emotional needs are being met and where he loves and is bonded with his relative care provider. These findings and conclusions, too, are supported by the evidence.

In recommending termination of Father's parental rights to all three children, CASA Martha Miller reported K.M. was "very happy" and "bonded" with his foster mother. *Transcript* at 216. Miller also informed the court that K.M. needs and deserves permanency in his life. Case manager Shutters likewise recommended termination, stating Father had never been "consistently stable" and that she agreed K.M. would be "better off" without Father being involved in his life. *Id.* at 288-89.

Based on the totality of the evidence, including Father's incarceration at the time of the termination hearing, unresolved substance abuse, admitted history of domestic violence with the children's mother, and current inability to demonstrate he is capable of providing the children with a safe and stable home environment, coupled with the testimony from Shutters, Tinsley, and Miller recommending termination of the parent-child relationship, we conclude that clear and convincing evidence supports the trial court's determination that termination of Father's parental rights is in K.M.'s best interests.

This Court will reverse a termination of parental rights "only upon a showing of 'clear error'– that which leaves us with a definite and firm conviction that a mistake has been made." *In re A.N.J.,* 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error

13

here.

Judgment affirmed.

RILEY, J., and MATHIAS, J., concur.